**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**TRAVIS BARKLEY and JEFFREY**
**BURFEIND**                                                                              **PLAINTIFS**

**V.**                                     **CASE NO. 4:19-cv-847-BSM**

**BOY SCOUTS OF AMERICA and**
**QUAPAW AREA COUNCIL INCORPORATED**
**OF THE BOY SCOUTS OF AMERICA**                              **DEFENDANTS**

## FIRST AMENDED COMPLAINT

COME NOW the Plaintiffs, Travis Barkley and Jeffrey Burfeind, by and through their

attorneys, Gillispie Law Firm, and Crew Janci LLP, and for their causes of action against the

above-named Defendants, state the following:

## JURISDICTION AND PARTIES

1.      Jurisdiction of this court is invoked pursuant to 28 U.S.C.S. § 1332 and 28

U.S.C.S. §1367.  Plaintiffs also request that this Court assume supplemental jurisdiction over

their state law claims arising under Arkansas state law.

2.      Venue is proper in the Eastern District of Arkansas by reason of title 28 U.S.C. §

1391, as all acts or omissions complained of in this Complaint occurred in the Eastern District of

Arkansas and the Defendant, The Boy Scouts of America, is a congressionally chartered

corporation with its principal place of business in Texas, and does business in the Eastern

District of Arkansas.

3.      Plaintiff Jeffrey Burfeind is an adult resident of the State of Florida. At all times

relevant to the tortious conduct alleged in this complaint, Plaintiff Jeffrey Burfeind was an

unemancipated minor who was invited to participate in meetings, events, and activities run and

sponsored by Defendants in Arkansas.

EXHIBIT 1

4.      Plaintiff Travis Barkley is an adult resident of the State of Mississippi. At all times relevant to the tortious conduct alleged in this complaint, Plaintiff Travis Barkley was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants in Arkansas.

5.      Boy Scouts of America ("BSA") was and is a congressionally chartered corporation, authorized to do business in Arkansas, with its principal place of business and its foreign agent for service located at 1325 W. Walnut Hill Lane, Irving, TX 75038.  BSA's Arkansas registered agent is located at 3220 Cantrell Rd., Little Rock, AR 72202.

6.      Quapaw Area Council Incorporated of the Boy Scouts of America (Quapaw Area Council) is a nonprofit corporation organized under the laws of the state of Arkansas and with its principal place of business and registered agent located at 3220 Cantrell Rd., Little Rock, AR 72202.  Quapaw Area Council is the successor in interest to the Ouachita Area Council. Defendant BSA and Quapaw Area Council will be referred to collectively as "Defendants."

7.      The Salvation Army is a foreign nonprofit corporation that has been authorized to do business in the state of Arkansas at all relevant times to this action. The Salvation Army's principal address is 1424 Northeast Expressway, Atlanta, GA 30329. Its Arkansas registered agent is the C.T. Corporation, which can be served with process at 124 West Capitol Ave., Suite 1400, Little Rock, AR 72201. At all relevant times, and upon information and belief, The Salvation Army was the chartering organization who sponsored the Plaintiffs' scouting units. Upon information and belief, and at all relevant times, The Salvation Army also employed Sam Otts, the volunteer scout leader who sexually abused the Plaintiffs.

8.      Defendants jointly own and operate scouting programs which invite and seek out the participation of children.  Defendants, through their agents and officials, have control over

those activities involving children.  Defendants have the power to appoint, supervise, monitor, restrict and fire each person working with children within the Defendants' scouting programs.

## FACTS

9.      Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

10.      In 1916, Congress granted BSA a federal charter, now codified as 36 U.S.C. Ch. 309.  Under that Charter, Congress granted BSA the exclusive right to BSA's name, emblems, badges, and descriptive words and markings.

11.      Since 1910, BSA has derived millions of dollars a year licensing the rights to its name, emblems, scouting paraphernalia, and BSA-branded merchandise to affiliated scouting organizations throughout the United States and abroad (See 36 U.S.C. §80305).  BSA has realized income from these assets by marketing them to parents and their children, including Plaintiffs and their parents.  In addition to its exclusive license, BSA enjoys numerous tax payer subsidies, including: (1) free access to national forest lands (16USC § 539f); (2) free use of Defense Department equipment and facilities for BSA Jamborees (10 U.S.C.§2554); (3) free ground and air transportation, communications, emergency, and technical services from the National Guard (32 U.S.C. § 508); (4) free use of meeting facilities, transportation, and support services at United States military bases world-wide (10 U.S.C. §2606); (5) free firearms, ammunition, repairs, supplies, and marksmanship training equipment (36 U.S.C. §40731); (6) free military surplus (10 U.S.C. Ch. 943); and (7) Department of Agriculture grants (7 U.S.C. §7630).

12.      BSA's marketing includes encouraging parents to enroll their children in Defendant's Scouting programs and activities.  Enrollment secures parents' and children's

commitment to follow a system that encourages parents to entrust their children's health and safety to BSA.  This entrustment empowers BSA to secure each child's affirmation of an oath to uphold the "Scout Law," to adopt the "Scout" identity, and to adhere to a system that requires children to engage in activities that expose them to adults and others.  This system includes overnight outings, camping events, and trips away from parents. The system is reward-based, obligating the child to purchase emblems, badges, and other Scouting paraphernalia, which in turn creates profit for the organization.

13.     BSA implements scouting programs through local Boy Scouts of America councils to which it issues licenses to the Boy Scouts of America name, emblems, badges, markings and youth programs.  BSA requires local councils and troops within a local council to strictly adhere to BSA's organizational charter and "Standards of Leadership" requirements.

14.     At all relevant times, the local council and troop to which Plaintiffs were members were the agents of the BSA and were subject to BSA's authority and control.

15.     BSA is one of the largest non-profits in the United States, with income exceeding $780 million dollars a year.  BSA is the largest youth organization in the United States, serving more than 2.7 million youth members, ages ten to eighteen, with over 1 million adult volunteers.

16.     Shortly after its inception, Defendant BSA became aware that a significant number of its adult Boy Scout leaders ("Scout Leaders") were using their position of trust and authority as Scout Leaders to manipulate and sexually abuse youth participating in Defendant BSA's scouting program.

17.     Since its inception, BSA aggressively marketed the wholesomeness and safety of its programs to the American public.  Simultaneously, BSA concealed from scouts and their parents BSA's certain knowledge that pedophiles had been infiltrating BSA in large numbers for

many years.  BSA also misrepresented to scouts and their parents that scouts were safe in

scouting programs, when, in fact, scouts were at an unreasonably heightened risk of sexual abuse

by adult scout leaders.  BSA made said misrepresentations to Plaintiffs and their parents.

18.     By the early 1920s, Defendant BSA implemented an internal "Red Flag" system

to identify Scout Leaders whom Defendant BSA considered "ineligible" to hold positions as

Scout Leaders.  This internal system eventually became known as the "Ineligible Volunteer

Files" (hereafter "I.V. Files").  Historically, the most common reason for a Scout Leader to be

placed in the I.V. Files has been allegations of sexual abuse of boys.  This subset of Ineligible

Volunteer files has been referred to by Defendants as the "Perversion Files."

19.     By 1935, Defendant BSA had already identified and removed over 1,000 adult

men from their positions as Scout Leaders for sexually abusing boys involved in Defendant

BSA's scouting program.

20.     Between 1935 and 1980, Defendant BSA identified thousands of additional Scout

Leaders who were believed to have sexually abused boys in Defendant BSA's scouting program.

Not all of these men were removed from their positions as Scout Leaders.  Rather, at some point

prior to 1955, Defendant BSA implemented a secret, internal "probation program."  Under

Defendant BSA's "probation program," a significant number of Scout Leaders believed to have

sexually abused boys were allowed to continue on as Scout Leaders with access to boys.  Neither

boy scouts nor their parents were informed if a Scout Leader was on "probation" or that the

reason for the probationary status was for sexually abusing boys.

21.     Defendant BSA went to significant lengths to keep the existence of their

"Perversion File" system and the problem of pedophile Scout Leaders a secret from scouts and

the public.  Local councils were instructed - and agreed - not to keep Perversion File materials at their offices, but rather to send everything to BSA national and destroy any copies.

22.     At some point between 1935 and 1980, Defendant BSA became aware that their internal "probation" program allowed pedophile Scout Leaders an opportunity to continue to abuse boy scouts.  Defendant BSA knew that, in some of these instances, Scout Leaders previously accused of sexual abuse of boys went on to reoffend against other boys. Nevertheless, Defendant BSA continued its probation program.

23.     Defendant BSA was also aware that local councils were sometimes unaware of the existence of the I.V. File system, did not know how to properly respond to allegations of child sexual abuse in their programs, and sometimes inadequately responded to such allegations resulting in further abuse of other boys.  Despite this knowledge, Defendant BSA did nothing prior to 1980 to inform, educate or train their local councils in how to identify, prevent or respond to incidents of child sexual abuse in their scouting programs.

24.     In addition to knowing that its probation program exposed children to known pedophiles, and that Councils were unaware of the I.V. system, BSA gained unique knowledge through its repository of informative data containing the identities and methods of pedophiles that had successfully infiltrated scouting.  The I.V. files highlight the vulnerabilities of Defendants' Scouting programs and activities, including pedophiles' techniques used to enter scouting, pedophiles' patterns for grooming victims, common circumstances in which abuse is perpetuated, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.  For a century BSA has known of distinctive characteristics of BSA's scouting programs that render scouts particularly prone to child sexual abuse by Scout Leaders.

25.      By 1935, BSA had accumulated approximately 1,000 files on pedophiles that had successfully infiltrated or attempted to infiltrate its program. Between 1935 and 1980, Defendant BSA received thousands of reports of Scout Leaders sexually abusing boys in their program. These reports were continuous in frequency over time and were spread throughout the geographic bounds of the Defendant BSA's scouting programs.

26.      In the 1970s, BSA recognized the potential liabilities represented by possessing and maintaining the I.V. files.  Over the course of two years in the early 1970s, three BSA executives reviewed and permanently destroyed thousands of I.V. files.  BSA executives kept no retention logs showing which or how many of the files BSA destroyed.  BSA made no contemporaneous record of its criteria in determining which files to destroy and which to save. Approximately 6,000 files survived BSA's file-purge and are in BSA's possession. Approximately 1900 of those files are now in the public domain.  (The exact number of sexual abuse reports received by BSA is unknown, in part because of the mid-1970s file purge.)  By 2005, BSA's secret cache of files on pedophiles exceeded 20,000.  These reports demonstrated to Defendant BSA that it had a continuous and systemic problem of Scout Leaders sexually abusing boys participating in the Defendants' scouting program.

27.      Defendants' knowledge of the danger of sexual abuse of boys in scouting included knowledge about how pedophile Scout Leaders accomplished their abuse.  Prior to 1980, Defendants knew or should have known that pedophile Scout Leaders groomed their victims to accomplish their abuse and understood how such grooming was accomplished (including using the Scouting program and activities to win the trust of victims, spending time alone with victims, and using mechanisms to lower victims' inhibitions and maintain victims' silence).

28.     The I.V. files demonstrate that BSA had evidence (1) that scouting was continuously attracting pedophiles across time and geography, and (2) of scouting's distinctive characteristics that make it attractive to pedophiles, including:

(a)     Scouting provides a pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes;

(b)     Scouting provides opportunities for a pedophile to seduce a boy by getting him into situations where the boy has to change clothing or spend the night with him;

(c)     A pedophile scout leader can, depending on the pedophile's preferred victim age, volunteer for and be sure to have access only to boys of a certain age;

(d)     Scouting conditions boys to the concept of strict obedience to the scout leader and a bonding mechanism that pedophiles utilize;

(e)     Scouting promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a pedophile's efforts to keep his victims silent and compliant;

(f)     Defendants conducted no criminal background checks on its volunteers;

(g)     Defendants did not prohibit adults from sleeping in tents with boys overnight;

(h)     Defendants did not prohibit adult leaders from spending time alone with individual scouts;

(i)     Defendants did not prohibit adult scout leaders from having contact with scouts outside of authorized scouting activities;

(j)     For decades, BSA re-admitted pedophiles who had previously been removed for child abuse (on "probation") without warning, thereby exposing unsuspecting children to sexual abuse;

(k)     BSA had a practice of not reporting scout abuse incidents to law enforcement;

(l)     BSA had a pattern of reaching an accommodation with a pedophile, in which the pedophile would resign from scouting and BSA would agree not to report the child sexual abuse to civil authorities;

(m)     BSA had a policy or practice of refusing requests to share its files or lists of known abusers with other youth organizations, despite knowing that pedophiles it had ejected often went on to join other youth-serving organizations;

(n)     BSA had a policy or practice of refusing to produce its I.V. files to its review board and scout-safety consultants, who were endeavoring to develop and implement meaningful safeguards and barriers to pedophile infiltration;

(o)     BSA refused to fingerprint, photograph or perform background checks on its adult volunteers, allowing removed pedophiles using an alias to sneak back into scouting through another troop;

(p)     BSA refused to utilize widely-accepted organizational best practices that would establish reasonable barriers to intrusion by pedophiles;

(q)     BSA refused to educate local councils, staff, and troop leaders regarding the true risks posed by pedophiles to scouts; and

(r)     BSA refused to effectively monitor local councils and troops to ensure that appropriate safeguards were being used in the selection and retention of adult scout leaders.

28.     Prior to 1980, Defendant BSA also knew or should have known that its I.V. File system did not function to prohibit all known predators from participating in Scouting, was otherwise flawed, and in many cases ineffective to address the sustained and systemic problem of sexual abuse of scouts by Scout Leaders.

29.     Despite their knowledge of the danger of sexual abuse of boys in scouting, at no time prior to 1980 did Defendants warn boys in their programs (or their parents) about this known danger or implement reasonable and feasible child abuse prevention policies.  Nor did BSA alert authorities to the nature and scope of this known danger.  Instead, Defendants intentionally and actively concealed the continuous and systemic danger of sexual abuse of boys in their program by Scout Leaders.  Defendants also actively promoted and represented to the public that their scouting programs were safe and wholesome and their Scout Leaders were safe and trustworthy.

30.     At all times relevant to this Complaint, Defendants invited participation of boys, including the Plaintiffs in this case, in their Scouting program and selected adults to serve as Scoutmasters or in similar leadership positions as Scout Leaders.

31.     BSA continues to make false and misleading public statements regarding the risks of sexual abuse in scouting; continues to minimize and downplay the harm of sexual abuse to children in scouting; fails to reach out to provide support and assistance to boys it knows were likely sexually abused by adult scout leaders; and continues to deny the truth about the extent of its historical knowledge of the nature and extent of sexual abuse of scouts by adult scout leaders.

32.     BSA has known for decades that scouting involved an unreasonably high risk of sexual abuse by adult scout leaders.  BSA made repeated false counterfactual claims that the number of pedophiles in scouting was insignificant, that scouts were reasonably safe from sexual abuse by adult scout leaders, and that BSA is not a magnet for pedophiles, all of which BSA made (1) knowing that the claims were false or (2) with reckless disregard for the truth or falsity.  Plaintiffs allege that they trusted BSA and that they reasonably relied upon the BSA's representations that it presented a moral and safe place for boys.

33.     Defendants selected or accepted Samuel C. Otts (hereafter "Otts") as a Scoutmaster, or in a similar capacity as a Scout Leader, for Plaintiffs' Boy Scout troop, Troop 16 and its affiliated Webelos Unit 13, both located in Hot Springs, Arkansas.  Troop 16 and Webelos Unit 13 were led by Otts and met at the Salvation Army in Hot Springs.

34.     Prior to selecting, appointing, and retaining Otts as a Scout Leader for Plaintiffs' troop, Defendants knew with certainty that:

(a)     Sam Otts had previously been reported to BSA for sexually abusing boys as a Scout Leader in Georgia, including in and around Mt. Berry, Georgia;

(b)     That BSA had itself determined that Sam Otts should be considered "ineligible" to volunteer with boys in Scouting due to the danger of sexual abuse of boys;

(c)     That Sam Otts exhibited behaviors known by BSA to indicate that Otts was a sexual predator who was intentionally using Scouting to gain access to boys, win their trust and admiration, and abuse them; and

(d)     That Sam Otts would sexually abuse boys in Scouting if allowed to return to Scouting.

35.     Despite the knowledge set out in previous paragraphs, Defendants authorized and empowered Otts to perform all duties of a Scout Leader within Troop 16 and Webelos Unit 13, including the authority and power to do the following: to provide instruction, counseling, moral guidance, and physical supervision of boys participating in Boy Scout programs and activities; to enforce the rules governing the boys' participation; and to undertake other duties.  Defendants knew that as part of his duties as a Scout Leader, Otts would be in a position of trust, confidence, and authority over the boys involved in the Scout Program, including Plaintiffs.  Defendants

empowered Otts in this way despite knowing for a certainty that Otts had previously sexually abused boys as a Scout Leader in Georgia.

36.     As a Scout Leader, Otts befriended Plaintiffs; gained the trust and confidence of Plaintiffs and their families as an instructor, guide, mentor, counselor, and authority figure; and gained the permission and support of Plaintiffs' families to spend substantial periods of time alone with Plaintiffs.  As a Scout Leader, Otts also gained the directive of Plaintiffs' parents to minor Plaintiffs that they respect those in authority with the BSA and Quapaw Area Council. Defendants allowed Otts to do so despite knowing that Otts had previously sexually abused boys as a Scout Leader in Georgia and posed a continuing danger to boys.

37.     Thereafter, Otts acted as a Scout Leader toward Plaintiffs, supervised them during Scouting outings and activities, and exercised authority *in loco parentis* over Plaintiffs during scouting events.

38.     Many of the Scouting outings and activities were conducted in geographically remote areas without any means of communication between Plaintiffs and their parents.  The circumstances surrounding the Scouting outings and activities deprived Plaintiffs of normal opportunities of self-protection.

39.     There was a special relationship between Plaintiffs and Defendants giving rise to a duty by Defendants to protect Plaintiffs from harm.

40.      As a result of Otts' authorized conduct as a Scout Leader, Plaintiffs were conditioned to trust Otts, to comply with his directions, and to respect Otts as a person of authority, including in moral and ethical matters.  Defendants placed Plaintiffs in this situation despite knowing for a certainty that Otts had previously sexually abused boys as a Scout Leader in Georgia.

41.     Using the power, authority and trust of his positions within the BSA and Quapaw Area Council, and availing himself of Defendants' representations that the Boy Scouts were moral and safe places for boys, Otts induced and directed Plaintiffs to engage in various sexual acts with Otts while Plaintiffs were minors (hereinafter "the sexual abuse").  Specifically:

(a)     Scout Leader Otts sexually abused Plaintiff Travis Barkley on multiple occasions in approximately 1979 and 1980 when Plaintiff Travis Barkley was approximately 10 to 11 years old. The abuse occurred during Scouting-related meetings, events, outings, and over-night excursions. Much of the abuse occurred in and around Hot Springs, Arkansas.

(b)     Scout Leader Otts sexually abused Plaintiff Jeffrey Burfeind in approximately 1979 when Plaintiff Jeffrey Burfeind was approximately 9 to 10 years old. The abuse occurred during Scouting-related meetings, events, outings, and over-night excursions. Much of the abuse occurred in and around Hot Springs, Arkansas.

42.     The methods used by Otts to accomplish his sexual abuse of Plaintiffs were substantially similar to methods known to Defendants to have been used previously by numerous other Scout Leaders to accomplish sexual abuse of other boys.

43.     Otts' sexual misconduct was foreseeable to Defendants.

44.     As set out in paragraphs 1 through 43 above, Defendants knew for decades prior to Plaintiffs' abuse that sexual predators of boys were continually infiltrating scouting and using the scouting program to accomplish their sexual abuse of boys. Defendants knew their scouting programs were attractive to pedophiles and knew the distinctive characteristics of scouting that render scouts particularly susceptible to pedophiles, including that:

(a)     Scouting provides the pedophile access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes. These settings place Scout Leaders in

close proximity to boys while they are particularly vulnerable, including while changing clothes, while bathing and during sleeping;

(b)     Defendants' scouting program taught, encouraged and conditioned boys to strictly obey Scout Leaders as trusted authorities;

(c)     Defendants' scouting program utilized and promoted the idea of (sometimes secretive) ceremonies, rituals, traditions and loyalty oaths, all of which Defendants knew or should have known could be manipulated by pedophile Scout Leaders to help maintain a sexual abuse victim's silence and compliance; and

(d)     Defendants' scouting program allowed pedophile Scout Leaders the opportunity to volunteer for and obtain access to boys of a certain age range which fit the pedophile's preference for victimization.

45.     Defendants knew or should have known the danger that pedophiles presented to boy scouts before Plaintiffs were abused and knew or should have known the danger that Otts specifically presented before Plaintiffs were abused.  Despite this knowledge, Defendants ignored the danger and permitted Otts and other pedophiles in scouting to prey upon young boys, including Plaintiffs, by failing to warn of the danger and failing to implement reasonable policies to prevent and identify child sexual abuse in scouting.[1]

46.      As a direct result of the Defendants' conduct described herein, Plaintiffs have suffered damages as follows:

(a)     Plaintiff Travis Barkley has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress and mental anguish, physical

---

[1] In further support of their claims that all Defendants knew or should have known the danger Otts posed Plaintiffs prior to their sexual abuse, Plaintiffs attach here, as Exhibit 1 to this Third Amended Complaint, the Affidavit of Wesley Walraven, which Plaintiffs only recently obtained.

manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, shame, and psychological injuries. Plaintiff Travis Barkley was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life; has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling; and, on information and belief, has incurred and will continue to incur loss of income and/or loss of earning capacity.

(b)     Plaintiff Jeffrey Burfeind has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress and mental anguish, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, shame, and psychological injuries. Plaintiff Jeffrey Burfeind was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life; has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling; and, on information and belief, has incurred and will continue to incur loss of income and/or loss of earning capacity.

## **COUNT ONE: NEGLIGENCE**
### **(against all Defendants)**

47.     Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

48.     Defendants owed Plaintiffs a duty to protect Plaintiffs based upon a special relationship between the Defendants and Plaintiffs, as well as the special relationship between Defendants and Otts, and Defendants' knowledge of Otts' dangerous propensities.

49.     Defendants breached the duty to protect Plaintiffs.

50.     Defendants' breach of its duty was the proximate cause of Plaintiffs' injuries.

51.     The harm suffered by Plaintiffs was foreseeable to Defendants.  Defendants knew

Otts presented an unreasonable risk of harm to Plaintiffs and other children.

52.     As a direct result of Defendants' negligent conduct, Plaintiffs have suffered the

injuries and damages described herein.

### COUNT TWO: NEGLIGENT HIRING, SUPERVISION, AND RETENTION
### (against all Defendants)

53.     Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

54.     Defendants knew that Otts presented an unreasonable risk of harm to Plaintiffs.

55.     Defendants were negligent in accepting Otts as a Scout Leader, in hiring Otts, in

how they supervised Otts in his position as a Scout Leader, and in retaining Otts as a Scout

Leader.

56.     Defendants' negligence in each of these regards was the proximate cause of

Plaintiffs' injuries.

57.     As a direct result of Defendants' negligent conduct in each of these regards,

Plaintiffs have suffered the injuries and damages described herein.

### COUNT THREE: FRAUD
### (against all Defendants)

58.     Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

59.     At all times relevant to this complaint, Defendants invited and encouraged

Plaintiffs to participate in the Scouting program that they administered and controlled, all the

while representing their program as being safe and beneficial for boys – physically, emotionally,

and spiritually.  This invitation created a special, fiduciary relationship, wherein these Plaintiffs

and their parents relied upon Defendants' expertise and judgment in selecting safe, moral and trustworthy men to lead Boy Scout Troops.

60.     Defendants' representations to Plaintiffs that Scouting was physically, emotionally, and spiritually beneficial, as well as safe, were substantial factors in influencing Plaintiffs' and their parents' decisions to participate in Scouting.

61.     As set out above, Defendants knew by at least 1975, if not earlier, that boys in Scouting were at risk of sexual abuse by Scout Leaders.  Defendants knew this because historically noticeable numbers of the adult volunteers participating in Scouting were discovered to be child molesters who used scouting to gain access to and earn the trust of Scouts.

62.     As further set out above, Defendants knew by at least 1977 that Otts had sexually abused at least one other boy as a Scout Leader in Georgia.

63.     Defendants had a duty to disclose known threats to the health and safety of the minors involved in their scouting programs.  In the first alternative, Defendants' invitation to Plaintiffs to participate in Scouting upon payment of a fee required Defendants to disclose all matters material to entering into the transaction, and known incidents of child molestation by Scout Leaders, including those of Samuel Otts, would have been material to Plaintiffs' decision to enter into the transaction with Defendants.  In the second alternative, Defendants actively concealed the problem of child molestation by Scout Leaders and actively concealed Otts' known history of child sexual abuse.

64.     Defendants' knowledge that pedophile Scout Leaders used the scouting program to accomplish sexual abuse of boys constituted a material fact – particularly in light of Defendants' failure to change the BSA program, policies, or procedures that in the past had been frequently used by pedophile Scout Leaders to accomplish sexual abuse of boys.  Plaintiffs

would not have entered into a relationship with Defendants, the scouting program, Otts, or any

other of Defendants' agents had they been aware of this fact.

65.    Defendants' knowledge that pedophile Scout Leader Samuel Otts had previously

used the scouting program to accomplish sexual abuse of boys constituted a material fact.

Plaintiffs would not have entered into a relationship with Defendants, the scouting program, Otts,

or any other of Defendants' agents had they been aware of this fact.

66.    Defendants fraudulently misrepresented, failed to disclose, and actively concealed

the dangers of sexual abuse of boy scouts by Scout Leaders in general and by Otts specifically

(hereinafter the "fraudulent representations").

67.    Defendants knew that the fraudulent representations involved false

representations or made the fraudulent representations with reckless disregard for the truth.

Defendants made the fraudulent representations with the intent of inducing Plaintiffs (and other

children similarly situated), Plaintiffs' parents (and other parents and guardians similarly

situated), and the community at large to rely on the fraudulent representations and thereby

continue to trust Defendants.  Defendants obtained a substantial economic benefit from this

reliance upon the fraudulent representations.

68.    Plaintiffs' (and their parents') reliance on the fraudulent representations resulted

in Plaintiffs engaging in a trust relationship with Defendants and their agents, including Otts.

The reliance of Plaintiffs and their parents was justified because they did not know, nor could

they reasonably have known, that Defendants were aware of a significant danger of sexual abuse

by Scout Leaders in general (based on the known sustained and systemic problem of pedophile

Scout Leaders using scouting to accomplish sexual abuse of boys) and of a significant danger of

sexual abuse by Otts specifically (based on Defendants' concrete knowledge that Otts had sexually abused scouts in Georgia prior to coming to Arkansas).

69.     Plaintiffs and their parents reasonably relied on the fraudulent representations by Defendants and reasonably believed that Scouting was safe (and did not pose a known danger of sexual abuse to Scouts).  Plaintiffs and their parents acted to their detriment in allowing Plaintiffs to participate in Scouting based on this reliance.

70.     Plaintiffs and their parents reasonably relied on the fraudulent representations by Defendants and reasonably believed that Otts was safe (and did not pose a known danger of sexual abuse to Scouts).  Plaintiffs and their parents acted to their detriment in allowing Plaintiffs to participate in Scouting with Otts based on this reliance.

71.     As a direct result of Defendants' fraud, Plaintiffs have suffered the injuries and damages described herein.

## FRAUDULENT CONCEALMENT

72.     Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

73.     Plaintiffs' claims for negligence and fraud against Defendants are timely because the applicable statutes of limitations were equitably tolled based on Defendants' fraudulent concealment (as set out in the following paragraphs).

74.     Plaintiffs' claims for negligence and fraud against Defendants were fraudulently concealed by Defendants.

75.     Defendants committed the following positive acts of fraudulent concealment of its negligence and fraud regarding Samuel Otts:

(a)     Intentionally secreting information received by BSA indicating that Otts had sexually abused a boy in Georgia in 1977;

(b)     Intentionally secreting the findings of their investigation regarding sexual abuse of a boy by Otts in Georgia;

(c)     Choosing not to inform or warn Scouting families in Arkansas about prior reports of abuse by Otts;

(d)     Concealing that they knew Otts presented an unreasonable risk of danger to boys, including Plaintiffs;

(e)     On information and belief, misrepresenting the reasons for Otts' departure from leadership of the Georgia troop;

(f)     On information and belief, facilitating or encouraging the payment of a severance for Otts to help ensure that information about his abuse of boys was kept secret;

(g)     Choosing not to report Otts to law enforcement or other civil authorities in Georgia;

(h)     Registering Otts as a Scout Leader in three scouting units within the Hot Springs community beginning in May of 1977, after having learned by no later than February 3, 1977 of the sexual abuse in Georgia, and while knowing that BSA had determined Otts should be "ineligible" to work with boys as a result of the abuse in Georgia;

(i)     Holding Otts out to the Hot Springs community as a safe and trustworthy Scout Leader who ascribed to the stated values of Scouting (while knowing Otts had sexually abused boys in the past and posed an unreasonable risk of re-offending);

(j)     On information and belief, putting Otts on BSA's internal "probation" program (whereby BSA intentionally allowed known sexual predators to continue to have contact with children);

(k)     On information and belief, intentionally secreting allegations of abuse against Otts in Arkansas;

(l)     On information and belief, intentionally secreting the findings of their investigation regarding sexual abuse of scouts by Otts in Arkansas;

(m)     Choosing not to report Otts to law enforcement or other civil authorities in Arkansas;

(n)     Affirmatively representing to families of Scouts that BSA had never received any allegations about Otts in the past;

(o)     Affirmatively telling a half-truth and intentionally misleading families of Scouts to believe that BSA had never received any allegations about Otts in the past;

(p)     Choosing not to inform or warn Scouting families in Arkansas about reports of abuse by Otts;

(q)     On information and belief, misrepresenting the reasons for Otts resignation from the three Hot Springs area troops;

(r)     Instructing Plaintiffs not to tell their parents about his abuse by Otts; and

(s)     Maintaining extensive documents regarding Otts in secrecy.

76.     Defendants committed the following positive acts of fraudulent concealment of its negligence and fraud regarding the nation-wide, systemic problem of sexual abuse in Scouting:

(a)     Creating, continuing, and maintaining a secret system for handling internal reports of abuse;

(b)     Adopting procedures, policies or practices requiring all reports of child sexual abuse in Scouting be kept secret within the organization;

(c)     Adopting procedures, policies or practices discouraging reporting to law enforcement allegations of child sexual abuse in Scouting;

(d)     Adopting procedures, policies or practices (internally called "Probation") allowing known child sexual abusers to continue on as Scout Leaders – sometimes in different geographic areas – without informing scouts or parents or Local Councils about the danger posed and while misrepresenting the Scout Leader on "probation" as safe and worthy of scouts' trust;

(e)     Requiring the documentation regarding instances of child sexual abuse in Scouting be sent to national headquarters (and forbidding the retention of such documents in local scout offices to avoid their discovery by outsiders);

(f)     Intentionally destroying documents regarding instances of child sexual abuse in Scouting;

(g)     Actively dissuading victims (and their parents) from reporting to law enforcement regarding abuse in Scouting;

(h)     Actively dissuading victims (and their parents) from taking civil legal action regarding abuse in Scouting;

(i)     Actively discouraging law enforcement and media from mentioning abusers' connections to Scouting; and

(j)     Actively maintaining the secrecy of BSA's database regarding child sexual abuse in Scouting (including opposing efforts by law enforcement, courts, and others to obtain documents from BSA's database).

77.     In light of the facts set out above, Plaintiffs could not, through their own
reasonable effort or diligence, have discovered Defendants' negligence, fraud, or sufficient other
facts upon which to bring their lawsuit against Defendants more than three years before filing
suit. Defendants' negligence and fraud could not have been discovered through reasonable
diligence at any point earlier than when it was discovered only recently.

78.     Plaintiff Travis Barkley did not know or have reason to know of the basis for his
claims of negligence and fraud against these Defendants until October of 2019, when he first
learned of the existence of the perversion file and that Defendants had known Otts was
dangerous before allowing him access to Barkley.  Barkley discovered his causes of action when
he learned three other victims of Otts had filed suit against these Defendants in Arkansas state
court, *Stevens, et al. v. Boy Scouts of America, et al*., 60CV-18-3729, and that the claims were
based on the Defendants' heretofore secreted "perversion file" on Samuel Otts, which contained
proof that BSA knew for a certainty that Otts was a pedophile prior to his being accepted as a
scout leader in Arkansas.  Again, Barkley was totally unaware of the existence of the perversion
file or of any media coverage of any kind related to Otts before October of 2019, when he
received correspondence alerting him to the Arkansas state court case.  [The first Plaintiff in the
state court case, William Stevens, discovered his causes of action against these Defendants in
November of 2016, after randomly performing an online search to determine if his abuser,
Samuel Otts, was still alive, which eventually led him to the hidden perversion file.]  The
information contained in this file was intentionally kept hidden from the world by BSA, and
Plaintiff Travis Barkley could not reasonably have been expected to discover it at an earlier date.
Moreover, the relative obscurity of the online database containing the perversion file made it

extremely difficult to discover.  A reasonable person in Plaintiff Travis Barkley's circumstances would not have discovered facts indicating BSA's negligence or fraud at an earlier date.

79.     Plaintiff Jeffrey Burfeind did not know or have reason to know of the basis for his claims of negligence and fraud against these Defendants until December 2018, when he first learned of the existence of the perversion file and that Defendants had known Otts was dangerous before allowing him access to Burfiend.  Burfiend discovered his causes of action when he learned three other victims of Otts had filed suit against these Defendants in Arkansas state court, *Stevens, et al. v. Boy Scouts of America, et al.*, 60CV-18-3729, and that the claims were based on the Defendants' heretofore secreted "perversion file" on Samuel Otts, which contained proof that BSA knew for a certainty that Otts was a pedophile prior to his being accepted as a scout leader in Arkansas.  Again, Burfiend was totally unaware of the existence of the perversion file or of any media coverage of any kind related to Otts before December of 2018, when he learned through social media of the Arkansas state court case.  [The first Plaintiff in the state court case, William Stevens, discovered his causes of action against these Defendants in November of 2016, after randomly performing an online search to determine if his abuser, Samuel Otts, was still alive, which eventually led him to the hidden perversion file.]  The information contained in this file was intentionally kept hidden from the world by BSA, and Plaintiff Jeffrey Burfeind could not reasonably have been expected to discover it at an earlier date. Moreover, the relative obscurity of the online database containing the perversion file made it extremely difficult to discover. A reasonable person in Plaintiff Jeffrey Burfeind's circumstances would not have discovered facts indicating BSA's negligence or fraud at an earlier date.

80.     BSA took affirmative action to prevent Plaintiffs' discovery of: (1) its knowing selection and retention of Otts despite actual prior knowledge that Otts had sexually abused boys in the past; and (2) its misrepresentations regarding the safety of Scouting (despite prior knowledge – and concealment – of extensive information regarding thousands of instances of child sexual abuse of Scouts by Scout Leaders).

81.     On information and belief, BSA's fraudulent concealment was furtively planned and secretly executed to keep Plaintiffs' causes of action (and similar causes of action) against BSA concealed.  In the alternative, on information and belief, BSA's fraudulent concealment was perpetrated in ways such that the concealment and Plaintiffs' causes of action against BSA concealed themselves.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through their attorneys, Joshua D. Gillispie of Gillispie Law Firm, and Crew Janci LLP, respectfully requests recovery for all damages previously pled herein, and for compensatory damages for the reasons previously pled and in an amount previously prayed for and/or allowed by common law or by statute, in an amount left to the sound discretion of the jury, but in an amount necessary to satisfy the jurisdictional limits of this Court or any other Court, unless said damages are set, in whole or in part, by statute, for their attorney fees and all costs herein expended, and for all other relief to which Plaintiffs are justifiably entitled.

Respectfully Submitted,

/s/ Joshua D. Gillispie

Joshua D. Gillispie, Ark. Bar No. 2010131
**Gillispie Law Firm**
1 Riverfront Place, Suite 605
North Little Rock, AR 72114
501-244-0700 (p);501-244-2020 (f)
josh@gillispielawfirm.com


*Counsel for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed on this day, and service shall be accomplished via the court's electronic filing system and/or US Mail on all counsel of record.


/s/ Joshua D. Gillispie
Joshua D. Gillispie

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**TRAVIS BARKLEY and JEFFREY
BURFEIND**                                                                          **PLAINTIFFS**

**V.**                                          **CASE NO. 4:19-cv-847-BSM**

**BOY SCOUTS OF AMERICA, and
QUAPAW AREA COUNCIL INCORPORATED
OF THE BOY SCOUTS OF AMERICA**                          **DEFENDANTS**

---

### AFFIDAVIT OF WESLEY WALRAVEN

---

1. My name is Wesley Walraven. My address is 1 Ridgewood Rd. SW, Rome, GA 30165. My mailing address is P.O. Box 5048, Rome, GA 30162. I am an investment banker; I live part time in New York City and part time in Rome, Georgia. My phone number is (706) 987-9710.

2. I was born 1/25/62. As a youth, I was very active in scouting in the Northwest Georgia Council during the late 1960s and 1970s. I reached the level of Eagle Scout and I was inducted into the Order of the Arrow and subsequently elected Lodge Chief for Waguli Lodge. I later reached the Order of the Arrow's highest level: Vigil. I loved my time in Scouting and it helped create the person I am today. Pete Parham was the district leader of the local council at this time and Herman Woods was a senior executive.

3. I was a camp counselor at Camp Sidney Dew for two summers in 1976 and 1977. Sam Otts was the quartermaster. Sam was in charge of supplies and ran the small store housed in the Supplies Building that sold things like candy and soda. The two summers I was there, a boy named Richard Wacker was assigned as quartermaster's assistant. I believe Richard was a year younger than me, probably 13 in 1976 and 14 in 1977. Richard Wacker had to sleep in the same full-size bed as Sam Otts in the Supplies Building both summers. All camp staff was aware and it was completely out in the open. Based on conversations I participated in and overheard, many of the other counselors teased Richard about the sleeping arrangements. Sam Otts was a very large and tall white-haired man and the idea of the two of them sharing a full-size bed was absurd. Herman Woods was a high-level district executive who was active at

1

EXHIBIT 1 TO FIRST AMENDED COMPLAINT

Camp Sidney Dew and it would have been impossible for him not to be aware of the sleeping arrangement.

4. While I was a youth in the mid-1970s, Sam Otts also served as an advisor to Waguli Lodge. Based on my role as Lodge Chief, I would have to go visit Otts at his faculty apartment at Berry College, where Otts worked as a teacher. We were planning a Council 5 "Conclave" which was to be held at Berry in 1977. One day I showed up at a pre-scheduled time to discuss the upcoming Conclave and Otts was gone. Evidently, he had left his job and residence at Berry College very suddenly. A few days later I was told that Otts was caught sexually molesting the very young son of another teacher at the college (in more explicit language than that).

5. A few months later, while attending an Order of the Arrow event at Camp Sidney Dew, I was working at the sign-in canopy-tent at the entrance to the Camp with Herman Woods, a senior executive of the District. I told Mr. Woods that I had heard about Sam Otts and I thought it was pretty messed up. Mr. Wood replied that Mr. Otts was lonely and had made a mistake and it was unfortunate. Even at that age I knew that what Mr Otts did was more than a "mistake" and I was shocked by Mr. Wood's response—so shocked that I still remember that conversation with him vividly.

6. A few years ago I saw on the news about the lawsuits against the BSA. I immediately searched "Samuel Otts' online and was shocked to learn that he had gone on to continue working with the Boy Scouts in Arkansas despite the Northwest Georgia District Officials clearly knowing he was a child molester. I then contacted counsel in Arkansas representing plaintiffs to let them know what I knew about Mr. Otts' history in Georgia.

*Wesley Walraven*

SIGNATURE

*Wesley Walraven*

PRINTED NAME

*May 17, 2023*

DATE

same for the purposes therein contained.  WITNESS my hand and official seal, this _17th_ day of May, 2023

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

06/29/2026

3